IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

| | | |
|---|---|---|
| RUBY L. TOLIVER; | ) | |
| ESTATE OF SAMUEL E. TOLIVER; | ) | |
| JONATHAN CULBERSON; | ) | |
| APRIL HEFLIN; | ) | |
| ESTATE OF JOHNNY LEE PARKS; | ) | |
| DEBORAH A. PIERSON; | ) | |
| LESTER A. PIPPINS; | ) | |
| WALTER PROCTOR; | ) | |
| RAY CHARLES WILLIAMS; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| KASIM REED, In his official capacity as | ) | |
| Mayor of the CITY OF ATLANTA; | ) | |
| N. LAMBERT, individually; | ) | JURY TRIAL REQUESTED |
| CHRISTOPHER S. THORNTON, | ) | |
| Individually; | ) | |
| APD OFFICER UNIT 1101, individually; | ) | |
| APD OFFICER UNIT 1103, individually; | ) | |
| APD OFFICER UNIT 1115, individually. | ) | |
| | ) | |
| Defendants. | ) | |
_____)

## **COMPLAINT**

COME NOW Plaintiffs who brings this Complaint seeking damages and

declaratory relief against Defendant City of Atlanta and the individual

Defendants pursuant to 42 U.S.C § 1983.  This action arises from a police raid (the

"Sanabella Raid," or simply the "Raid") conducted by officers of the Atlanta Police Department at Ruby's Sanabella Restaurant and Lounge (the "Sanabella Restaurant") on May 3, 2010.  In violation of the Fourth and Fourteenth Amendments to the United States Constitution the individual Defendants forced entry into the Sanabella Restaurant with a crow bar and a hammer but without a warrant, probable cause, or exigent circumstances.  The individual Defendants searched the premises and searched and seized all persons inside the establishment without regard for individual suspicion or probable cause.

JURISDICTION

1.

This action arises under the authority vested in this Court by virtue of 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.  This Court is authorized to grant declaratory relief pursuant to 28 U.S.C.A. § 2201 and 28 U.S.C. § 2202.

VENUE

2.

Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391.  The City of Atlanta, Georgia, ("Atlanta") is within this judicial district and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

<u>PARTIES</u>

3.

Plaintiff Ruby L. Toliver ("Ruby Toliver") is a resident of Georgia. Ruby Toliver is the widow of Samuel E. Toliver ("Samuel Toliver").

4.

Ruby Toliver and Samuel Toliver were the owners and operators of Ruby's Sanabella Restaurant and Lounge, located at 1355 Joseph E. Boone Blvd in Atlanta, Georgia, at all times pertinent to the allegations in this complaint.

5.

Plaintiffs anticipate amending this complaint to substitute Ruby Toliver for the Estate of Samuel E. Toliver when Ruby Toliver is appointed Executor or Administrator of the estate of her late husband.

6.

Neither Ruby Toliver nor Samuel Toliver were present during the Sanabella Raid, and references in this complaint to Plaintiffs who were seized, frisked, and searched during the Raid do not refer to Ruby Toliver or Samuel Toliver.

7.

Plaintiff Jonathan Culberson ("Culberson") is a resident of Georgia. Culberson was present during the Sanabella Raid.

8.

Plaintiff April Heflin ("Heflin") is a resident of Georgia.  Heflin was present during the Sanabella Raid.

9.

Johnny Lee Parks ("Parks") was a resident of Georgia and is now deceased.  Parks was present during the Sanabella Raid.  Plaintiffs anticipate amending this complaint to substitute his widow, Rosa Lee Taylor, for Estate of Johnny Lee Parks when Rosa Lee Taylor is appointed Executor or Administrator of the estate of her late husband.

10.

Plaintiff Deborah A. Pierson ("Pierson") is a resident of Georgia.  Pierson was present during the Sanabella Raid.

11.

Plaintiff Lester A. Pippins ("Pippins") is a resident of Georgia.  Pippins was present during the Sanabella Raid.

12.

Plaintiff Walter Proctor ("Proctor") is a resident of Georgia.  Proctor was present during the Sanabella Raid.

13.

Plaintiff Ray Charles Williams ("Williams") is a resident of Georgia. Williams was present during the Sanabella Raid.

14.

Kasim Reed is sued in his official capacity as mayor of the City of Atlanta ("Defendant City of Atlanta"), a City chartered under the laws of the State of Georgia and subject to the jurisdiction and venue of this Court.  The Atlanta Police Department (APD) is a division of Defendant City Atlanta.

15.

Defendant N. Lambert ("Lambert") was a Sergeant of the Atlanta Police Department and acted under color of state law at all times pertinent to the allegations in this complaint.

16.

Defendant Christopher S. Thornton ("Thornton") was an officer of the Atlanta Police Department and acted under color of state law at all times pertinent to the allegations in this complaint.

17.

Defendant APD Officer Unit 1101 was an officer of the Atlanta Police Department and acted under color of state law at all times pertinent to the allegations in this complaint.  The name of this individual, who was assigned APD Unit Number 1101 at the time of the events described in this complaint, is not presently known to Plaintiffs, who anticipate amending this complaint when his or her identity becomes known.

18.

Defendant APD Officer Unit 1103 was an officer of the Atlanta Police Department and acted under color of state law at all times pertinent to the allegations in this complaint.  The name of this individual, who was assigned APD Unit Number 1103 at the time of the events described in this complaint, is not presently known to Plaintiffs, who anticipate amending this complaint when his or her identity becomes known.

19.

Defendant APD Officer Unit 1115 was an officer of the Atlanta Police Department and acted under color of state law at all times pertinent to the allegations in this complaint.  The name of this individual, who was assigned APD Unit Number 1115 at the time of the events described in this complaint, is

not presently known to Plaintiffs, who anticipate amending this complaint when his or her identity becomes known.

FACTUAL ALLEGATIONS

20.

In the early morning hours of May 3, 2010 Defendant Thornton and other individual Defendants arrived at the Sanabella Restaurant.

21.

According to APD Incident Report 10-123-0230-00 the individual Defendants were allegedly responding to a report of a "bar/night club operating after hours."  (APD Incident Report 10-123-0230-00.)

22.

Upon arriving at the Sanabella Restaurant, Defendant Thornton found the door locked.  (APD Incident Report 10-123-0230-00.)

23.

Defendant Thornton untruthfully stated in his Incident Report: "Through the front red door window, I observed several patrons inside actively consuming alcoholic beverages as well as eating." (APD Incident Report 10-123-0230-00.)  In

fact the only thing visible through the front door window was the rear wall of the restaurant's small entrance vestibule; the window did not have a line-of-sight to anyplace in the restaurant other than the vestibule itself and Defendant Thornton could not have seen anyone eating or drinking inside the restaurant.

24.

Under the direction of Defendant Thornton and other individual Defendants the locked door of the restaurant was forced open "by crow bar and hammer." (APD Incident Report 10-123-0230-00.)

25.

Defendant Thornton and the other individual Defendants entered the Sanabella Restaurant after the door was forced open.

26.

Defendant Thornton and other individual Defendants walked through all areas of the Sanabella Restaurant, including the kitchen and bathroom, and also searched inside refrigerators, drawers, a closet, and other closed areas.

27.

Defendant Thornton and other individual Defendants detained all persons inside the Sanabella Restaurant including those Plaintiffs who were present during the Raid.

28.

According to APD Incident Report 10-123-0230-00, "All patrons of the location were detained."  (APD Incident Report 10-123-0230-00.)

29.

Defendant Thornton and other individual Defendants frisked, searched, and seized IDs from persons inside the Sanabella Restaurant including Plaintiffs who were present during the Raid.

30.

According to APD Incident Report 10-123-0230-00, "All detained patrons were checked through ACIC, and no active warrants were found." (APD Incident Report 10-123-0230-00.)

31.

Defendant Thornton and/or other individual Defendants arrested Carlos Eundra Brooks (the bartender and manager of the Sanabella Restaurant on duty on the day of the Raid) and charged him with violating O.C.G.A. § 3-3-7 and O.C.G.A. § 16-10-24(a).

32.

None of the Plaintiffs in this action were charged with any crime.

<u>CLAIMS FOR RELIEF</u>

Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

**Unlawful Entry and Search of Sanabella Restaurant**

33.

The individual Defendants had neither a warrant nor probable cause plus exigent circumstances authorizing entry into the Sanabella Restaurant.

34.

The forced entry into the Sanabella Restaurant by the individual Defendants in the absence of a warrant or probable cause plus exigent

circumstances was an unreasonable search under the Fourth and Fourteenth Amendments to the United States Constitution.

35.

The individual Defendants violated clearly established law; no reasonable officer could have believed that it was lawful to force entry into private property without either a warrant or probable cause plus exigent circumstances.

**Unlawful Seizure**

36.

The individual Defendants had neither reasonable articulable suspicion nor probable cause, particularized to each individual, to believe that Plaintiffs who were present during the Raid were involved in criminal activity.

37.

The seizure by the individual Defendants of all persons inside the Sanabella Restaurant without regard to individualized reasonable articulable suspicion or probable cause was unreasonable and in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

38.

The individual Defendants violated clearly established law; no reasonable officer could have believed that it was lawful to seize individuals in the absence of reasonable articulable suspicion or probable cause particularized to the individual seized.

**Unlawful Frisk**

39.

The individual Defendants had no reasonable belief that any of the Plaintiffs who were present during the Raid were armed and dangerous.

40.

The frisk of Plaintiffs who were present during the Raid was unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution.

41.

The individual Defendants violated clearly established law; no reasonable officer could have believed that it was lawful to frisk an individual for weapons without reasonable suspicion that the individual was armed and presently dangerous.

**Unlawful Search**

42.

The search of the Plaintiffs who were present during the Raid was unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution.

43.

The individual Defendants violated clearly established law; no reasonable officer could have believed that it was lawful to search the Plaintiffs who were present during the Raid in the absence of consent, a warrant, or probable cause plus exigent circumstances.

**Unlawful Arrest**

44.

The detention of Plaintiffs who were present during the Raid was excessive and unreasonable in duration and scope and constituted an arrest for which probable cause was required.

45.

The individual Defendants had no probable cause to believe that Plaintiffs who were present during the Raid had committed or were committing any criminal offense.

13

46.

The arrest of Plaintiffs who were present during the Raid was an unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

47.

The individual Defendants violated clearly established law; no reasonable officer could have believed that it was lawful to arrest an individual without probable cause to believe that he or she had committed a crime.

48.

In all the foregoing, the individual Defendants acted with reckless, deliberate and callous indifference to the constitutionally protected rights of the Plaintiffs.

## LIABILITY OF THE CITY OF ATLANTA

### Unconstitutional Policies, Customs, and Practices

49.

At all times relevant to the events described in this complaint the Atlanta Police Department had a policy, custom, and practice to frisk, detain, and

perform ID checks on all persons at the location of suspected criminal activity without regard to individualized suspicion.

50.

During the investigation of the "Atlanta Eagle Raid" (which took place on September 10-11, 2009 and was the subject of litigation in Calhoun v. Pennington, Civil Action File 1:09-CV-3286-TCB, U.S.D.C., N.D.Ga), APD Sgt. John Brock testified that he ordered all persons inside the Atlanta Eagle bar to be detained and have their IDs checked pursuant to this APD policy, and that former APD Chief Richard Pennington had criticized previous operations in which this policy had not been followed.

51.

After the "Atlanta Eagle Raid" Chief Pennington acknowledged that this was a common practice at APD and described it as "normal procedure." With regard to the patrons present during the "Atlanta Eagle Raid" Chief Pennington also stated publicly that "each person would have had to been frisked for the police officers' safety." (Sept. 14, 2009 Press Conference by Chief Pennington, http://www.publicbroadcasting.net/wabe/news.newsmain/article/2866/0/ 1554435/Atlanta.Morning.Edition/APD.Chief.Says.Undercover.Officers.Twice.V isited.Gay.Bar).

15

52.

In discussing the "Atlanta Eagle Raid" at a community forum on October 5, 2009, APD Deputy Chief Carlos Banda stated: "We do criminal history checks on everybody when we hit an establishment, no matter what it is. . . . At this point, that's the policy." (http://www.youtube.com/watch?v=cjTYf2WHWbw#t=08m43s.)

53.

APD Major Debra Williams also confirmed this policy during the same community forum.  Major Williams stated: "Once we're inside a location based on any illegal activity, for the safety of not only the citizens of the City of Atlanta but for the safety of the patrons and the officers, we conduct warrant checks on all the patrons, on everyone."

54.

Other formal policies of the Atlanta Police Department which authorize suspicionless seizures, frisks, and searches include APD Standard Operating Procedure 3065 (which authorizes and instructs officers to detain and frisk individuals without regard to reasonable articulable suspicion) and APD Standard Operating Procedure 3020 (which authorizes officers to perform warrantless searches without probable cause).

55.

The custom and practice of the Atlanta Police Department to perform suspicionless and otherwise unlawful seizures, frisks, and searches is also reflected by the frequent, known, and openly tolerated instances of such seizures and searches.  Among many others instances to be proven at trial after discovery, these violations included:

a)  The unlawful search of 1056 Dill Avenue by Sergeant Wilbert Stallings and other APD officers in October, 2005 (for which Sgt. Stallings was sentenced to 18 months in federal prison);

b)  The unlawful arrest of Deborah Schowalter in January, 2006 (for which the City of Atlanta eventually paid a settlement of $25,000.00);

c)  Various Fourth Amendment violations associated with the death of Kathryn Johnston in November, 2006 (for which the City of Atlanta eventually paid a settlement of $4,900,000.00);

d)  The unlawful stop and arrest of Kelvin Bryant on October 16, 2008, by Atlanta police officers Brandon Jackson, James Menzoian, William Porter, and Jason Overbaugh, about which a federal judge found "that the officers did not have probable cause or even reasonable suspicion to stop [Bryant's] vehicle." (See United States v, Kelvin Bryant, 1:09-CR-018-JEC, U.S.D.C.-N.D.Ga);

e)  The unlawful arrest of Minnie Carrie in March, 2009 (for which the City of Atlanta eventually paid a settlement of $20,000);

**Failure to Train and Discipline**

56.

Despite knowledge of pervasive Fourth Amendment violations, the City of Atlanta acted with deliberate indifference to the rights of persons such as Plaintiffs with whom the police would come into contact by failing to provide appropriate training, guidance, and discipline to Atlanta police officers.

**Improper Training of Officers:  The Defense of the "Atlanta Eagle" Case**

57.

The city of Atlanta's defense of the officer conduct during the "Atlanta Eagle Raid" (as reflected by public statements by senior APD officials, the prolonged defense of liability in Calhoun v. Pennington, and the prolonged refusal to admit that officers acted unlawfully at the Atlanta Eagle) served to improperly train APD officers, including the individual Defendants in this action, that it was permissible to detain, frisk, search and ID check all persons found at the scene of alleged criminal activity without regard to individualized suspicion.

18

58.

During the Sanabella Raid the individual Defendants in this action conducted themselves in essentially the same manner as the officers in the Atlanta Eagle Raid; at the time of the Sanabella Raid on May 3, 2010 the APD and the City of Atlanta Law Department were still defending this conduct as lawful and thereby training officers that this type of conduct was permissible.

**Failure to Train Officers About the Fourth Amendment**

59.

The Atlanta Police Department has demonstrated a pervasive failure to train officers regarding the requirements of the Fourth Amendment.

60.

Numerous Fourth Amendment violations by Atlanta police officers have demonstrated the compelling need for effective training regarding constitutional law which the Atlanta Police Department has failed or refused to provide.

61.

On July 14, 2009, the Atlanta Citizen Review Board ("ACRB") recommended that the Atlanta Police Department conduct training regarding

Fourth Amendment issues including "Terry stops."  The Chief of Police rejected this recommendation.

62.

In connection with its investigation of the Atlanta Eagle Raid the ACRB reviewed "records concerning the department's in-service training for officers during 2008 and 2009.  There was no indication officers received training concerning constitutional law."

63.

The ACRB "Study of Supervisory Responsibility" regarding the Atlanta Eagle Raid also reported that:  "It became evident during the course of the investigation that many officers are unfamiliar with the constitutional requirements for conducting a search and/or seizure."

64.

Deposition testimony and other statements related to the Atlanta Eagle Raid by senior APD commanders including former Chief Richard Pennington, Deputy Chief Carlos Banda, and Major Debra Williams also suggest a pervasive lack of training regarding basic Fourth Amendment concepts such as the requirements of a lawful Terry stop; the requirements of a lawful frisk; and the definition of an arrest, among other subjects.  These statements suggest both the failure of the Atlanta Police Department to train these employees themselves, as

20

well as the improper training provided by senior commanders to the

subordinates who look to them for guidance.

65.

The Atlanta Police Department's pervasive lack of training regarding

fundamental Fourth Amendment concepts is also suggested by the inaccurate

legal conclusions contained in numerous Atlanta Police Department Internal

Affairs reports, including, as just one example, the original Internal Affairs report

about an incident involving James Hereford, which was approved by Internal

Affairs commander Major E.B. Dancy and Deputy Police Chief E.N. Finley.

**Failure to discipline**

66.

The Atlanta Police Department has demonstrated a pervasive failure to

discipline police officers for unlawful searches and seizures.

67.

At the time of the Sanabella Raid on May 3, 2010 the City of Atlanta had

not disciplined any of the police officers who searched and seized dozens of

individuals without reasonable suspicion during the "Atlanta Eagle Raid."  To

the contrary, at the time the individual Defendants in this action decided to

conduct themselves in a similar fashion the City of Atlanta was still actively and publicly defending the conduct of the "Atlanta Eagle Raid" officers.

68.

Defending the conduct of the Atlanta Eagle officers rather than imposing prompt discipline demonstrated to other members of the Atlanta Police Department, including the individual Defendants in this action, the City of Atlanta's deliberate indifference to the violation of Fourth Amendment protections.

69.

As another example, although the Atlanta Citizen Review Board ("ACRB") has sustained complaints against dozens of police officers for unlawful conduct the Atlanta Police Department has a pattern of not following the ACRB's recommendations to impose discipline.

70.

As just one specific example among many to be proven at trial, the ACRB recommended that discipline be imposed against the officer who unlawfully arrested Minnie Carrie but the Chief of Police rejected that recommendation.

**PRAYER FOR RELIEF**

On the basis of the foregoing, Plaintiffs respectfully pray that this Court:

1) Assume jurisdiction over this action;

2) Award Plaintiffs actual damages, including compensation for physical pain and injury, mental anguish, emotional distress, and damage to property;

3) Award Plaintiffs general damages in an amount to be determined by the jury;

4) Award Plaintiffs nominal damages for violations of Plaintiffs' constitutional rights;

5) Award Plaintiffs punitive (exemplary) damages against the individual Defendants to the extent permitted by law;

6) Declare that Defendants violated Plaintiffs' rights under the United States Constitution;

7) Award attorney's fees under 42 U.S.C. § 1988 and any other applicable provision of law;

8) Award such other and further relief as the Court deems just and proper.

A JURY TRIAL IS REQUESTED

Respectfully submitted this 25 day of July, 2011.

/s/ Daniel J. Grossman
Daniel J. Grossman
Georgia Bar No. 313815
Law Office of Daniel J. Grossman
1579 Monroe Drive, Ste F-138
Atlanta, GA 30324
Dan@DanGrossmanLaw.com
(404) 654-0326


Attorney for Plaintiffs